United States District Court
Southern District of Texas
**ENTERED**
January 09, 2024
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | § |
| | §   **CRIMINAL ACTION NO. 4:20-CR-** |
| **VS.** | § **00501** |
| | § |
| **JUSTIN MOUTON** | § |

### MEMORANDUM & ORDER

Before the Court is the government's application to involuntarily medicate Justin Mouton in an effort to restore his competence to stand trial. ECF No. 102. For the reasons stated below, the Motion is **DENIED**.

### I.   FACTUAL AND PROCEDURAL BACKGROUND

Justin Mouton was arrested on February 12, 2020 after he was allegedly found to be in possession of a loaded pistol. A grand jury subsequently indicted Mouton under 18 U.S.C. § 922(g)(1) for unlawful possession of a firearm. At a detention hearing and arraignment held on February 17, 2021, it was ordered that Mouton be detained pending trial. ECF No. 15.

On March 13, 2022, Mouton filed an Unopposed Motion for Determination of Mental Competence to Stand Trial. ECF No. 27. The Court granted the Motion and ordered Mouton committed to the custody of the Attorney General for a reasonable period not to exceed 30 days for placement in a suitable facility where a psychological or psychiatric examination could be conducted. ECF No. 28. The Bureau of Prisons completed its evaluation four months later, at

1

which time it issued a report opining that Mouton was not competent to stand trial. On August 18, 2022, the Court held a hearing on the competency issue and determined that Mouton was at that time mentally incompetent. 8/18/2022 Minute Entry.

On the same day, the Court committed Mouton to the custody of the Attorney General for a period not to exceed four months so that his likelihood of attaining competency could be evaluated. ECF No. 34. What transpired next was a series of substantial delays on the part of the government in transferring Mouton to a competency restoration facility.[1] In doing so, the government violated several orders from the Court explicitly requiring Mouton be transferred to a competency restoration facility within a specific timeframe. The result was that Mouton languished in jail for nine months awaiting transfer in violation of his due process rights. ECF No. 99 at 4. After extensive intervention from the Court, the government finally executed Mouton's transfer, and he was placed in United States Medical Facility in Springfield Missouri (USMCFP Springfield) on May 18, 2023. The Court noted, at several points, its censure of the government's conduct.

After conducting an evaluation, the Bureau of Prisons issued a forensic psychological report on September 28, 2023. The report was authored by two USMCFP employees: Dr. Katlyn Hanson and Dr. Sarah Burton. The report found that Mouton suffers from schizoaffective disorder, bipolar type and opined that medication was the only way to potentially restore Mouton to competency. The report further concluded that involuntary medication was medically appropriate.

A *Harper* hearing was held on August 29, 2023 to determine whether Mouton met the criteria for involuntary medication due to dangerousness to self, dangerousness to others, or grave

---

[1] The specifics of this delay are described in detail in the Court's June 7, 2023 Memorandum & Order. ECF No. 99.

disability. The hearing officer found that Mouton did not meet the criteria for involuntary medication under that standard.

The government then moved to compel involuntary medication to restore competency. On December 4, 2023, the Court held an evidentiary hearing (*Sell* hearing) to determine if Mouton met the criteria for forced medication articulated in *Sell v. United States,* 539 U.S. 166 (2003). At the *Sell* hearing, the government presented three witnesses: Dr. Katlyn Hanson, a post-doctoral fellow at USMCFP Springfield; Dr. Sarah Burton, a forensic psychologist who evaluated Mouton at USMCFP Springfield; Dr. Shawn Rice, a psychiatrist at USMCFP Springfield. The government has also submitted the forensic psychological report authored by Dr. Hanson and Dr. Burton as well as a proposed treatment plan created by Dr. Rice.

## II.   APPLICABLE LAW

The Fifth Amendment's Due Process Clause guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend. V. The Supreme Court has repeatedly recognized that individuals have a constitutionally protected liberty interest in avoiding the involuntary administration of antipsychotic drugs. *Sell v. United States*, 539 U.S. 166, 178 (2003); *Riggins v. Nevada*, 504 U.S. 127, 134-35 (1992); *Washington v. Harper*, 494 U.S. 210, 221 (1990); *see also United States v. James*, 938 F.3d 719, 723 (5th Cir. 2019) ("Forced medication would be a significant incursion into James's liberty."). This right can only be overcome by an "essential" or "overriding" state interest. *Sell*, 539 U.S. at 178-79.

To determine whether ordering involuntary medication is appropriate, *Sell* mandates the application of a four-factor test, which asks (1) whether important governmental interests are at

stake; (2) whether involuntary medication will significantly further those interests; (3) whether involuntary medication is necessary to further those interests; and (4) whether the administration of the drugs is medically appropriate. *Id.* at 180-81. To prevail, the government must prove each of the four elements by clear and convincing evidence. *James*, 938 F.3d at 723. Only in "rare" instances will the government be able to meet this burden. *Sell*, 539 U.S. at 180.

### III. ANALYSIS

Mouton contends that the government has failed to meet its burden on factors one, two, and four. Each is analyzed below in turn.

#### a. Factor One: Whether important governmental interests are at stake.

"First, a court must find that *important* governmental interests are at stake." *Sell*, 539 U.S. at 180. Generally, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." *Id.* However, courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution," because special circumstances "may lessen the importance of that interest." *Id*. This analysis functionally involves asking two successive questions: (1) is the defendant charged with a "serious" crime such that the government has an important interest in prosecution and (2) are there special circumstances that diminish the government's interest.

The answer to the first question is relatively clear. If convicted, Mouton faces a maximum sentence of up to ten years, making this a serious offense under the Fifth Circuit's interpretation

of the phrase. *See United States v. Palmer*, 507 F.3d 300, 304 (5th Cir. 2007) (finding that charges with a ten-year maximum sentence qualify as "serious"); *United States v. Mann*, 532 F. App'x 481, 494 (5th Cir. 2013) (same).

Next, the Court must evaluate whether special circumstances diminish the government's interest in prosecution. *Sell* recognized that one such special circumstance is "the possibility that the defendant has already been confined for a significant amount of time." 539 U.S. at 180. Although the Court in *Sell* did not clarify what constitutes a "significant amount of time," the Fifth Circuit's decision in *United States v. Harris* provides a particularly instructive example of how to operationalize this standard. 84 F.4th 596 (5th Cir. 2023). In that case, Harris had been detained pre-trial for almost 44 months and would be detained for 48 to 52 months by the time his competency could be restored and his case adjudicated. *Id.* at 599. Because the applicable guideline range for his offense was only 37 to 46 months, the Fifth Circuit found the length of his detention constituted a special circumstance that limited the government's interest in prosecution. *Id.* Others have found even shorter pre-trial detainment periods to be sufficiently lengthy to diminish the government's interest in prosecution. *See, e.g.*, *United States v. Cardenas-Castaneda*, No. EP21CR00663FMATB, 2022 WL 2063731, at *4 (W.D. Tex. June 8, 2022) (over 14 months in custody pre-trial); *United States v. Queen*, No. EP-20-CR-80-DB, 2021 WL 5506737, at *4 (W.D. Tex. Nov. 24, 2021) (almost 24 months in custody pre-trial); *United States v. Barajas-Torres*, No. CRIM.EP-03-CR-2011KC, 2004 WL 1598914, at *3 (W.D. Tex. July 1, 2004) (8 months in custody pre-trial).

The length of Mouton's pre-trial detainment is comparable to that in *Harris*. Mouton has already been in custody for over 34 months. If involuntary medication is ordered, he will likely be detained far longer before his case can be adjudicated. Before treatment can proceed, Mouton will

5

have to be returned to USMCFP Springfield. This is no small feat given that it took BOP nine months to transfer him there in the first place. Once there, he would then undergo involuntary treatment. At the *Sell* hearing, Dr. Hanson testified that it is likely to be between 4 to 12 months before Mouton is returned to competency, assuming the medication is effective, and Dr. Rice indicated that on average it takes around 5 to 6 months for medication to restore competency. Mouton will then need to be transferred back to Houston, which again raises the potential for delays. Finally, Mouton's case must actually be tried.

Mouton's likely guideline range is 33 to 41 months.[2] Mouton's time served has already surpassed the lower end of this range. And, even under a conservative estimate, Mouton's pre-trial detainment will likely reach 41 months by the time his case is adjudicated. Realistically, it is probable that his detainment will substantially exceed 41 months by the time he is tried considering the penchant for delay and lackadaisical approach to due process that the BOP has displayed in this case. Accordingly, Mouton's extended pre-trial confinement decidedly curtails the government's interest in prosecution.

The government unsuccessfully argues that the proper comparator for this analysis is not the likely guideline range, but rather the statutory maximum. In support of this assertion, the government cites *Gutierrez*, where the Fifth Circuit analyzed the length of the defendant's pre-trial detainment in the context of the maximum sentence he might receive if convicted. *United States v. Gutierrez*, 704 F.3d 442, 451 (5th Cir. 2013). The government urges the Court to read

---

[2] This estimate assumes a base offense level of 14. U.S. Sent'g Guidelines Manual § 2K2.1(a)(6). Two levels are added given that the government alleges that the firearm involved was stolen. *Id.* § 2K2.1(b)(4)(A). Mouton is estimated to have 8 criminal history points, placing him in criminal history category IV. *Id.* § 4A1. The result is a guideline range of 33-41 months. The Court reiterates that this figure is a non-binding estimate. Should Mouton be sentenced, his guideline range and eventual sentence may diverge from this approximation.

*Gutierrez* to require the first *Sell* factor to be assessed based on Mouton's potential maximum sentence rather than his likely sentence under the guidelines.

Unfortunately, this reading of *Gutierrez* is plainly in conflict with the Fifth Circuit's more recent opinion in *Harris*, where it applied the sentencing guidelines to assess the first *Sell* factor. Such a result could not have been possible if *Gutierrez* mandated application of the statutory maximum. In fact, at the *Sell* hearing in this case, the government conceded that it could not make sense of *Harris* under its proffered interpretation of *Gutierrez*.

Instead of reading discord into this circuit's precedent, the Court opts for an approach that harmonizes *Harris* and *Gutierrez*. That is, the Court interprets *Gutierrez* to *permit*, not *require*, district courts to consider the statutory maximum. This conclusion is supported by the text of *Gutierrez*, where the Fifth Circuit stated only that "[i]t is not appropriate . . . to require a district court to conduct a mock sentencing hearing and select a provisional sentence at a *Sell* hearing." *Gutierrez*, 704 F.3d at 451. Notably absent from *Gutierrez* is any finding that it would be appropriate to require district courts to apply the statutory maximum. Moreover, while the Fifth Circuit declined to mandate that district court utilize the sentencing guidelines, it did not prohibit their use, contrary to the government's suggestions. This interpretation is confirmed by the fact that other courts have similarly utilized a defendant's likely guideline range in conducting this analysis, even after *Gutierrez*. *See, e.g.*, *United States v. Queen*, No. EP-20-CR-80-DB, 2021 WL 5506737, at *4 (W.D. Tex. Nov. 24, 2021).

Additionally, the government's reading does not comport with the Fifth Circuit's rationale in *Gutierrez*. Due to "the broad discretion of the district judge to impose a sentence outside the advisory guidelines range," the Fifth Circuit declined to compel district courts to apply the

7

guideline range in assessing the first *Sell* factor. *Gutierrez*, 704 F.3d at 451. Given the same broad judicial discretion permits sentencing below the statutory maximum, it would be similarly nonsensical to compel district courts to employ the statutory maximum for this analysis. Thus, the reasoning in *Gutierrez* prevents the Court from adopting the government's position.

Even using the statutory maximum of 10 years, Mouton is likely to have already served a substantial portion of his sentence by the time trial is concluded. *See United States v. Cardenas-Castaneda*, No. EP21CR00663FMATB, 2022 WL 2063731, at *4 (W.D. Tex. June 8, 2022) ("The Court notes that the total combined time that Defendant could be confined is upwards of three or four years before the case is adjudicated. If found guilty and sentenced, Defendant would have already served a significant portion of the potential ten-year maximum sentence."). For the reasons described above, it may take as long as three or four more years[3] before Mouton is returned to competency and his case is tried, placing his total pre-trial detention at roughly six to seven years. Assuming his competency can be restored and he is convicted of the crime with which he is charged, this pre-trial detainment comprises a significant portion of the ten-year maximum he could receive. Thus, under either framework Mouton's lengthy pre-trial detainment constitutes a special circumstance that markedly lessens the government's interest in prosecution.

Further, the unsettled constitutionality of the crime Mouton has been charged with further calls into question the government's interest in prosecution. Mouton is charged with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). In *United States v. Rahimi*, the Fifth Circuit

---

[3] That is, it may take as long as 9 months to transfer Mouton back to USMCFP Springfield, 12 months to return him to competency, 9 months to return Mouton to Houston, and 12 months for his case to reach the conclusion of trial. While the Court is hopeful that competency restoration will be speedy, that the BOP will be able to conduct future transfers more efficiently, and that the parties will be ready for trial in relatively short order, it finds that using estimates that assume continued administrative delay is more appropriate for this analysis. That is, if the Court is to assess Mouton's time served in the context of the maximum possible sentence Mouton is legally allowed to receive, analytic consistency demands the Court also consider the maximum possible time he might be detained pre-trial.

held a different part of § 922(g) to be unconstitutional given the Supreme Court's recent decision in *Bruen*. *United States v. Rahimi*, 61 F.4th 443, 461 (5th Cir. 2023) (interpreting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)). That decision is now before the Supreme Court. *United States v. Rahimi*, 143 S. Ct. 2688 (2023) (granting cert). The issue of § 922(g)(1)'s constitutionality similarly remains unsettled, as "the Fifth Circuit has not addressed § 922(g)(1) in light of *Bruen*." *United States v. Mosely*, No. CR H-22-620, 2023 WL 4765596, at *2 (S.D. Tex. July 26, 2023) (Rosenthal, J.). While the Fifth Circuit has not yet weighed in, others have found § 922(g)(1) to be unconstitutional as applied. *See also Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 106 (3d Cir. 2023); *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309, at *31 (S.D. Miss. June 28, 2023).

The Court need not opine on whether § 922(g)(1) is constitutional to resolve the present dispute. However, pursuant to *Sell*'s mandate that courts "must consider the facts of the individual case in evaluating the Government's interest in prosecution," the Court cannot ignore recent challenges to § 922(g)'s constitutionality. *Sell*, 539 U.S. at 180. The government objects that *Sell* does not explicitly list the unresolved constitutionality of a criminal statute as a "special circumstance." However, the Fifth Circuit has unequivocally read the examples tendered in *Sell* to be "non-exhaustive" and has considered special circumstances outside of the few *Sell* put forth. *United States v. Harris*, 84 F.4th 596, 600 (5th Cir. 2023). Accordingly, the Court finds that the unsettled constitutional questions related to the statute Mouton is charged under further reduce the government's interest in prosecution. While Mouton's unusually lengthy pre-trial detention is independently sufficient to diminish the government's interest in prosecution, the uncertain future of the statute underlying his charge offers additional support for the finding that special circumstances lessen the government's interest here.

### b. Factors Two and Four: Whether involuntary medication is substantially likely to render Mouton competent and whether the administration of drugs is medically appropriate.[4]

The second *Sell* factor is whether involuntary medication will significantly further the government's interest. *Sell*, 539 U.S. at 181. This standard requires the government to prove that the involuntary medication is both "substantially likely to render the defendant competent to stand trial," and is "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Id.* The fourth *Sell* factor requires the Government to show "that administration of the drugs is medically appropriate, *i.e.,* in the patient's best medical interest in light of his medical condition." *Id.* This analysis also necessitates consideration of the likely side effects of the treatment. *Id.* Both factors must be analyzed in the context of the specific drugs and dosages the BOP wishes to administer. *Id.* ("The specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success."); *United States v. Hernandez-Vasquez*, 513 F.3d 908, 916-17 (9th Cir. 2008); *United States v. Chavez*, 734 F.3d 1247, 1252 (10th Cir. 2013).

The Government has put forth sufficient evidence to meet its burden under the second and fourth *Sell* factors. Although Mouton initially objected to the government's failure to specify what medication it wishes to administer and at what doses, the government has remedied this issue by providing a treatment plan containing this information. ECF No. 104-1. Moreover, at the *Sell*

---

[4] Because of the overlapping proof required by these factors, they are analyzed in tandem.

hearing, Dr. Rice spoke to the specific effects of each of the drugs in the proposed treatment plan. Specifically, Dr. Rice offered testimony as to the likely side effects of the medications, their likelihood of restoring competency, and their efficacy in treating schizoaffective disorder, bipolar type.[5]

This is not to say that the Court is without serious concerns as to the side effect profile of the suggested drugs. As the forensic psychological report stated, "[t]he sensitivity of individuals to medication side effects varies widely, with some individuals experiencing minor or no side

---

[5] The Government offered additional evidence in the form of a study assessing the efficacy of involuntary treatment in restoring competency. *See* Robert E. Cochrane, Bryon L. Herbal, Maureen L. Reardon & Kristina P. Lloyd, *The Sell Effect: Involuntary Medication Treatment is a "Clear and Convincing" Success*, 37 L. & HUM. BEHAV. 107 (2013). The Court finds that this study has minimal probative value insofar as it was primarily authored by three employees and one future employee of the Federal Medical Center (FMC), which is operated by the Bureau of Prisons. Others have expressed similar suspicion of an older study co-authored by employees of the FMC. *See United States v. Rix*, 574 F. Supp. 2d 726, 735 (S.D. Tex. 2008) (questioning the reliability of a study addressing the efficacy of involuntary treatment given "that the authors of the study are employees of the Federal Medical Center who are frequently called to testify on behalf of the Government in *Sell* proceedings."). The authors of the Cochrane study are similarly frequently called to testify on behalf of the government during *Sell* hearings. *See, e.g.*, *United States v. Sanderson*, 521 F. App'x 232, 234 (4th Cir. 2013); *United States v. Coy*, 991 F.3d 924, 926 (8th Cir. 2021); *United States v. Horton*, 941 F. Supp. 2d 843, 849 (N.D. Ohio 2013); *United States v. Johnson*, No. CR 06-1037, 2007 WL 1455756, at *3 (N.D. Iowa May 17, 2007), *report and recommendation adopted*, No. 06-CR-1037-LRR, 2007 WL 1597641 (N.D. Iowa June 1, 2007); *United States v. Almendarez*, 179 F. Supp. 3d 498, 506 (W.D. Pa. 2016). Moreover, the Cochrane study contains serious design defects that undermine its reliability. As the study itself recognizes, it employs a small sample size, lacks a control group, and is not double blind. In particular, the lack of double blinding is particularly concerning, as it means that the doctors who are assessing the result (i.e., whether competency has been restored) are biased towards a positive result as they are aware that involuntary treatment has commenced, and in fact often testified in favor of involuntary treatment. *See generally United States v. Arena*, No. 21-MJ-671-MJP, 2023 WL 3734291, at *10-12 (W.D.N.Y. May 31, 2023) (questioning the conclusions of the Cochrane study in light of its inconsistency with other academic studies on the efficacy of certain treatments).
Moreover, the government's burden is to show that "the proposed treatment plan, *as applied to this particular defendant,* is 'substantially likely' to render the defendant competent to stand trial and 'substantially unlikely' to produce side effects so significant as to interfere with the defendant's ability to assist counsel in preparing a defense." *United States v. Evans*, 404 F.3d 227, 242 (4th Cir. 2005). The government cannot carry its burden by simply citing the generalized results of involuntary treatment on individuals with a variety of different mental illnesses and who were involuntarily treated with a range of different medications at different doses. *See United States v. Chavez*, 734 F.3d 1247, 1252 (10th Cir. 2013) ("[T]estimony regarding . . . the success rates and side effects of a few common antipsychotic drugs is of limited value in completing a proper analysis under the second and fourth parts of *Sell*."); *United States v. Benitez*, No. 19-CR-80141, 2021 WL 3500872, at *7 (S.D. Fla. June 22, 2021), *report and recommendation adopted*, No. 19-CR-80141-RAR, 2021 WL 3493255 (S.D. Fla. Aug. 9, 2021) ("[T]he Government wants this Court to extrapolate and glean from **general** studies and data sufficient information to allow the Court to formulate the **specific** missing medical opinion that, in Defendant's particular case, he is substantially likely to be restored to competency to stand trial if he is involuntarily medicated. This the Court simply cannot do." (emphasis in original)).

effects on a medicine that causes significant side effects in another individual." ECF No. 102-1 at 12. Moreover, at the *Sell* hearing Dr. Rice testified that, in his experience, about one in five patients taking the proposed medications develops tardive dyskinesia, a condition which causes, among other things, involuntary movements and permanent disfiguring. Dr. Rice further testified that he was aware of no cure for this condition and that it does not cease upon stopping medication. *See United States v. Rix*, 574 F. Supp. 2d 726, 736 (S.D. Tex. 2008) (finding tardive dyskinesia resulting from Haldol to be a significant side effect, the possibility of which outweighed the possible benefits of involuntary treatment). However, in the absence of any contravening medical testimony, the Court accepts the conclusions offered by the government's medical experts that the proposed treatment's benefits to Mouton's well-being outweigh the risk of side effects like tardive dyskinesia. In sum, the Court concludes that the government has met its burden under these factors, having shown that involuntary treatment is likely to restore Mouton's competency and is medically appropriate.

### IV.    CONCLUSION

The government must satisfy all four *Sell* factors before this Court may authorize involuntary medication. *James*, 938 F.3d at 723. Although the government has met the requirements under factors two, three, and four, it fails to satisfy the first factor. Finding that the government's interest in prosecution here is insufficient to outweigh Mouton's Fifth Amendment rights, the Court cannot order Mouton be involuntarily medicated. *See, e.g.*, *Cardenas-Castaneda*, 2022 WL 2063731, at *5; *Barajas-Torres*, 2004 WL 1598914, at *3. The government's application to involuntarily medicate Mouton to restore his competence to stand trial is hereby **DENIED.**

**IT IS SO ORDERED.**

Signed at Houston, Texas on January 4, 2024.

                                                Keith P. Ellison
                                                United States District Judge